UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JERRY LEE COCHRANE,

                    Petitioner,                              Case No. 1:09-cv-382

v.                                                           Honorable Robert J. Jonker

CARMEN D. PALMER,

                    Respondent.
_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner was convicted by a Saginaw County jury of assault of a prison employee, MICH. COMP. LAWS § 750.197c, escape, MICH. COMP. LAWS § 750.193, and assaulting a police officer, MICH. COMP. LAWS § 750.81d.  On November 29, 2006, he was sentenced, as a fourth felony offender, MICH. COMP. LAWS § 769.12, to respective prison terms of 4 years and 10 months to 15 years, 6 years and 4 months to 29 years, and 3 years and 10 months to 15 years.  In his *pro se* petition, Petitioner raises three grounds for relief, as follows:

I.    THE TRIAL COURT DENIED MR. COCHRANE HIS CONSTITUTIONAL RIGHT T[O] SELF-REPRESENTATION WHEN IT REFUSED HIS UNEQUIVOCAL REQUEST FOR SELF-REPRESENTATION MADE THROUGHOUT THE PROCEEDING.

II.   DUE PROCESS REQUIRES VACATING APPELLANT'S CONVICTION FOR PRISON ESCAPE, WHERE APPELLANT MERELY VIOLATED A CONDITION OF HIS PAROLE AND THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT A CONVICTION.

III.  A.    TRIAL COUNSEL'S FAILURE TO FILE NECESSARY MOTIONS, PROPERLY INVESTIGATE THE CHARGES, OR PROVIDE

ANY MEANINGFUL DEFENSE DEPRIVED MR. COCHRANE OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL, AND;

IV.   B.   THE TRIAL COURT DENIED MR. COCHRANE HIS SIXTH AMENDMENT RIGHT TO A FAIR TRIAL BY REFUSING TO ACCEPT ANY PLEADINGS FILED BY MR. COCHRANE, WHEN FILED *PRO SE* DUE TO COUNSEL'S INEFFECTIVENESS.

Respondent has filed an answer to the petition (docket #7) stating that the grounds should be denied because they are without merit. Upon review and applying the AEDPA standards, I find that Petitioner's first ground is meritorious. Accordingly, I recommend that the petition be conditionally granted unless Petitioner is retried within 120 days.

## Procedural History

### A.   Trial Court Proceedings

The state prosecution arose from an incident at the Buena Vista Corrections Center on November 15, 2004. Petitioner was charged with one count each of assaulting or resisting a police officer, felonious assault, assaulting a prison employee, and escaping from prison. Following a preliminary examination held November 24, 2009, Petitioner was bound over on all four charges.

Thereafter, Petitioner was represented by a succession of attorneys and appeared before a series of judges. On July 20, 2005, Petitioner's original counsel, Joseph Luplow, moved to withdraw. At a hearing held July 26, 2005 before the Hon. Leopold Borrello, the date previously scheduled for trial, counsel represented that there had been a breakdown in the attorney-client relationship. According to counsel, Petitioner had asked his attorney to file certain motions, which his attorney had refused to file. (7/26/05 Hr'g Tr. at 3-4, docket #13.) Counsel indicated that he could not in good conscience concur in Petitioner's proposed defense strategy or file the many motions Petitioner wanted. (*Id.*) Defendant contended that the Corrections Center did not have

- 2 -

authority to hold him, and he claimed to have sent Luplow evidence that would prove his contention. Petitioner advised that he did not want Luplow representing him because Luplow did not concur in Petitioner's assessment of the evidence. (*Id.*) After being advised that his trial would necessarily be adjourned if the motion to withdraw were granted, Petitioner asked the court to grant the motion and to appoint new counsel. (*Id.* at 5-6.) The court granted the motion to withdraw. (*Id.*)

       Attorney A. Lee Sturtz was appointed to represent Petitioner on August 1, 2005. (Cir. Ct. Docket Sheet at 2, docket #10.) On September 8, 2005, defense counsel filed a motion for discovery. (*Id.* at 3.) On September 27, 2005, defense counsel filed a motion to adjourn the trial. Both motions were set for hearing on October 4, 2005. (*Id.*) The court granted Petitioner's motion to adjourn trial and ordered the prosecution to produce all documents related to the reasons Petitioner was being detained at the Corrections Center and the issuance of parole condition 3.8. (10/4/05 Hr'g Tr. at 6-7, docket #14.)

       On October 18, 2005, defense counsel filed a motion to quash Count III (escape) of the indictment and a motion to strike Count I (assault of a prison employee) or II (felonious assault). (Cir. Ct. Docket Sheet at 3.) At the October 24, 2005 hearing on the motions, counsel argued that Counts I and II were duplicative and violated double jeopardy. (10/24/05 Hr'g Tr. at 3-5, docket #15.) The court took both motions under advisement. On October 31, 2005, the court denied both motions. (Cir. Ct. Docket Sheet at 4.)

       On November 1, 2005, defense counsel filed a motion for discovery from the Michigan Department of Corrections and from the Saginaw Police Department. On November 30, 2005, defense counsel moved to withdraw. (Cir. Ct. Docket Sheet at 4.) At a hearing held December 13, 2005, Petitioner stated on the record that he wanted attorney Sturtz to step down.

(12/13/05 Hr'g Tr. at 3, docket #16.)  The court warned Petitioner that, if it granted the motion to withdraw, the trial would again need to be adjourned.  (*Id.*)  Petitioner complained that his attorney kept refusing to file motions Petitioner wished to have filed.  Petitioner acknowledged that he understood that trial would need to be adjourned if counsel was allowed to withdraw and he still wished counsel to withdraw.  (*Id.* at 4.)  The court granted the motion.  (*Id.*)

The court appointed William White as Petitioner's third attorney on December 16, 2005, and trial was rescheduled for March 14, 2006.  (*Id.*)  On January 26, 2006, counsel filed a motion to compel discovery and a motion to adjourn trial.  That same date, Petitioner filed a motion to represent himself with the assistance of counsel.  (*Id.* at 4-5.)  The motions were heard on February 27, 2006.  The court granted portions of the motion to compel, but it denied Petitioner's request to order the Director of the Michigan Department of Corrections (MDOC), the Director of Policy for the MDOC, and a parole board member to appear for trial.  (2/27/06 Hr'g Tr. at 5-6, docket #17.)  The court then considered Petitioner's motion to represent himself at trial.  Counsel represented that his client was quite knowledgeable and could probably represent himself with assistance from counsel.  The court denied the motion, reasoning as follows:

> THE COURT:  Well, the charges here are assault of a[] prison employee, assault with a dangerous weapon.  Those are the charges that have relevance to this case, to this – the trial in this case, escape from prison, assaulting and resisting and obstructing a police officer.  Those are the charges, and that's the charges that we have to deal with.
>
> And it seems to me, just by reviewing the motions that this man wants, would cause a lot of problems in the court.  I don't know what education he has or what his ability is to – but I think he would cause some difficulty with the Court in staying with the – what's relevant.  I'm going to deny the motion for – to represent himself. Mr. White's a very capable attorney, and he's been appointed by the court to represent him.  And apparently, he's doing what his – what his client instructs him to do.  All right.

- 4 -

(*Id.* at 7-8.)  Counsel's motion to adjourn trial was based on counsel's previously scheduled vacation plans.  The court granted the motion, rescheduling the trial to March 28, 2006.  (*Id.* at 8-9.)  On March 28, 2006, however, defense counsel was in the emergency room, so trial was again adjourned.  At the proceeding in open court, Petitioner advised the court that he had filed a grievance against his attorney.  (3/28/06 Hr'g Tr. at 3-4, docket #18.)  Trial was adjourned until May 23, 2006.

On May 15, 2006, defense counsel moved to withdraw as counsel.  The motion was heard on May 23, 2006, the date set for trial.  Because Judge Borrello had retired, Hon. Darnell Jackson was assigned to the case.  Petitioner again expressed his desire for counsel to withdraw, and he complained that every time he got close to trial, his attorney moved to withdraw.  He also complained that no attorney had utilized the evidence he had provided.  Because the trial delays were affecting his chances of parole, Petitioner again expressed his desire to represent himself.  (5/23/06 Hr'g Tr. at 3-5, docket #19.)  The court granted both counsel's motion to withdraw and Petitioner's request to represent himself, stating as follows:

> THE COURT:  Okay.  All right.  Mr. White, I'm going to grant the order allowing you to withdraw as counsel at this time.
>
> Mr. Cochrane, I'll refer you back and we'll have somebody to assist you *and you'll be able to represent yourself next time.*

(*Id.* at 5 (emphasis added.))

Unfortunately, the docket sheet fails to reflect the court's order granting Petitioner's request for self-representation.  (Docket #10 at 6.)

Counsel's fourth attorney, George C. Bush, was appointed on May 30, 2006 and trial was rescheduled for July 25, 2006.  (Cir. Ct. Docket Sheet at 6.)  On the date set for trial, Judge Jackson recused himself from the case.  The judge indicated that, before becoming a circuit judge,

- 5 -

he was the district judge who issued a warrant for Petitioner's arrest.  To avoid the appearance of impropriety, the judge felt it necessary to recuse himself.  (7/25/06 Hr'g Tr. at 3, docket #20.)  The case was transferred to Hon. Robert L. Kaczmarek that same date.  Notwithstanding Judge Jackson's May 23, 2006 determination that Petitioner could represent himself, the docket sheet reflects that Petitioner, through counsel, again moved to represent himself on July 25, 2006, and Judge Kaczmarek took the motion for self-representation under advisement.  (Cir. Ct. Docket Sheet at 6.)  In an order issued August 3, 2006, Judge Kaczmarek denied the motion, apparently because the matter had previously been decided by Judge Borrello.  (*Id.* at 7; Tr. I[1] at 9.)  He makes no reference to Judge Jackson's subsequent order.  According to the docket sheet, on August 28, 2006, Petitioner filed yet another motion to represent himself in the proceedings.  (Cir. Ct. Docket Sheet at 7.)  Trial was rescheduled to begin on October 31, 2006.  (*Id.*)

On the morning of trial, the case was transferred to yet another judge, Hon. Fred Borchard, because Judge Kaczmarek was in the middle of a civil trial.  (Tr. I at 3.)  The prosecutor placed on the record a plea offer that remained open to Petitioner.  Petitioner rejected the plea offer.  (*Id.* at 8.)  Trial counsel advised Judge Borchard that Petitioner wished to represent himself:

> MR. BUSH:  . . . I was appointed to replace William White.  Mr. Cochrane continually indicated he wants to represent himself and on – he's notified the Courts of that, and – by two different judges at three different times he's been – that motion's been denied . . . .

---

[1]Transcripts of the five-day trial are referenced as follows:

October 31, 2006 (docket #21) –  Tr. I
November 1, 2006  (docket #22) – Tr. II
November 2, 2006 (docket #23) – Tr. III
November 3, 2006 (docket #24) – Tr. IV
November 6, 2006 (docket #25) – Tr. V

> He's continually – he's written me saying he wants – he wants to represent himself and so forth.  Apparently he contacted the grievance commission to know [sic] avail, but there we are.

(*Id.* at 5-6.)  Petitioner told the court that he had repeatedly asked his attorneys to file motions that they refused to file.  Petitioner stated that he had attempted to file those motions himself, but they were rejected because he was represented by counsel.  (*Id.* at 7-8.) Petitioner also advised Judge Borchard that Judge Borrello[2] had previously granted his motion to represent himself and had told Petitioner that he would appoint an attorney (Mr. Bush) to assist him.  (*Id.* at 8.)  The prosecutor, however, who had been at the hearing before Judge Jackson, asserted that Judge Borrello had denied the motion and that Petitioner had only renewed his motion in front of Judge Kaczmarek, who had denied it saying that Judge Borrello already had decided it.  (*Id.* at 9.)  Thus, since neither the defense attorney Bush, or the prosecutor, had been at the Jackson hearing, the docket sheet failed to reflect Judge Jackson's order, and petitioner mis-spoke by naming the wrong judge, it is not surprising Judge Borchard remained ignorant of Judge Jackson's order.

Judge Borchard advised Petitioner that he had one of the best attorneys in Saginaw County, but Petitioner stated that, if he were required to keep his attorney, he would prefer to not even appear in court.  (*Id.* at 9-10.)  Petitioner again complained that his attorney had not filed motions or subpoenaed witnesses, including MDOC Director Patricia Caruso. (*Id.*) Defense counsel advised the court that Judge Borrello had previously denied the defense motion to call Caruso and other witnesses.  (*Id.* at 11.)  After reviewing some of Petitioner's documents, the court determined

---

[2]Petitioner was mistaken in identifying the judge who granted his motion.  Judge Jackson granted the motion, not Judge Borrello.  In all other respects, however, Petitioner's representation was accurate.  This mistake, however, was not inconsequential to petitioner's quest to represent himself.  As will be seen, when petitioner said Judge Borello had granted the motion, and the prosecutor, who had not appeared before Judge Jackson, said something to the contrary, Judge Borchard would presumably credit the representation of the attorney and not realize Judge Jackson had issued such an order.

that Petitioner's motions, including his motion to represent himself, had previously been ruled upon and therefore would be denied.  (*Id.* at 21.)   Of course, he was mistaken as to the last order, and petitioner had been granted his constitutional right of self-representation.  The court did, however, ask the prosecutor to attempt to find witness Stan Harris.  (*Id.* at 26.)  Petitioner again indicated that he wished not to appear unless he could represent himself.  (*Id.* at 21.)  As the court attempted to understand what had transpired and what Petitioner wanted, Petitioner became increasingly frustrated, becoming argumentative and disruptive, speaking out of turn and interrupting, despite multiple reminders and warnings.  (*Id.* at 8-26.)  The court warned Petitioner that he could not continue to blurt out statements and that he had to work through his attorney.  (*Id.* at 27.)

At the noon recess, the court made a record outside Petitioner's presence, documenting Petitioner's demeanor:

> THE COURT:  The Court at this time will recall the matter of the People of the State of Michigan versus Jerry Lee Cochrane.  The record should reflect the Court is in session with prosecutor and defense counsel, Mr. Bush.  The defendant is not present.  The Court has requested that he not be present so that I can make a separate record, as the Court is of the opinion that to discuss what I'm about to discuss would irritate and in all probability set the defendant off.

> For purposes of the record this morning, Mr. Cochrane was in here, and the record will obviously reflect what he said on the record.  What does not appear on the record is his demeanor and temperament, and I would ask either counsel if they disagree with anything I say and an opportunity that they'll be given to certainly put their observations on record, but Mr. Cochrane had mentioned to, I believe, the corrections officers before Court started this morning that he was going to not cooperate with Mr. Bush and spit at Mr. Bush, the defense attorney.

> He did not sit down during the entire session this morning and remained standing, cut the different speakers off at various times and had to be politely cautioned by the Court not to interrupt.

> The Court would also note and reiterate that Mr. Bush is the fourth attorney on this particular case.  This particular judge, and I think I speak for the other judges in this Circuit, has the utmost respect for Mr. Bush and his abilities as a defense

counsel and all the experience he's had, and he certainly has addressed problems he's had on the record with this gentleman.

The Court would also reiterate for the record that this gentleman had indicated at one point did not want to be present. The Court had cautioned him that if – if he did disrupt the proceedings, he would be removed. I have made an effort to try and see whether there is the capability of setting up a video with this gentleman at the jail in one of the video rooms with cameras here in the courtroom and that does not appear to be a possibility, as I understand the District Court – six District Court judges use those particular facilities although that may remain a possibility. And the Court will – if that becomes an issue, the Court will readdress that and check on that.

The Court also spoke with the transport officers from the prison and as well as the gentleman that is in charge of security for the fourth floor, and they were all of the opinion that concerns are such that Mr. Cochrane should have this leg brace on, which I understand would lock up if he attempts to run.

The Court still has concerns because of his size and his temperament that he's shown this morning that he may take a swing at Mr. Bush or my law clerk, who is seated only approximately six feet from him. For this reason, and I believe both corrections officer[s] had indicated that – and, Max, is that – I don't want to stick words in your mouth, but is that also your impression that he should not only [have] the leg brace on, but also belly chains with his arms in the chains?

THE DEPUTY:  Yes, sir.

THE COURT:  The Court expects that he is going to cause problems and, as indicated, he keeps reiterating and wanting to go over things that have been previously discussed by counsel; and, again, if I've said anything that's not appropriate or painted a picture that either counsel do not agree with or the security, I would appreciate it if they would speak up.

(Tr. I at 28-30.)  Neither attorney had objections to the comments or to Petitioner's placement in

belly chains.  (*Id.* at 30-31.)

Petitioner's trial began in the afternoon of October 31, 2006 and concluded on

November 6, 2006.  MDOC Parole Officer Joe Wilson testified that, in August 2004, he was

responsible for supervising Petitioner's parole.  (Tr. II at 14-15.)  Petitioner was paroled on August

6, 2004 under a parole order, which Petitioner had signed, that included a number of conditions,

including Petitioner's participation in the Short Terms of Punishment (STOP) Program, a drug diversion and treatment program.  (*Id.* at 16.)  An additional condition, Special Condition 3.8, was added on August 10, 2004, and Wilson witnessed Petitioner signing that condition.  (*Id.* at 17.) Petitioner attended treatment at the Corrections Center and complied with his parole until October 20, 2004, when he failed to provide a urine specimen on demand at the Corrections Center.  He was charged with violating his parole.  (*Id.* at 18.)  Wilson gave Petitioner a copy of the parole-violation form, but Petitioner refused to sign, and Wilson so noted on the form.  (*Id.* at 19.)  As a consequence of failing to provide a urine sample, Petitioner was required to spend three days as an inpatient at the Corrections Center.  (*Id.* at 21.)  When he refused to sign the parole-violation report, Wilson scheduled a preliminary parole violation hearing, to be held on November 4, 2004.  (*Id.* at 21.)

In the meantime, although Petitioner was kept at the Corrections Center briefly after being issued the parole violation on October 20, 2004, he began to experience chest pains and was transported to the hospital.  Once he was released from the hospital that afternoon, he was brought back to the Corrections Center.  (*Id.* at 19-20.)  However, because he could not get his prescriptions filled at the Center, he was again released on October 21, 2004, so he could get medical clearance and his medication.  (*Id.* at 20.)  He returned to the Corrections Center a week later, and he was given a copy of his charges on November 1, 2004.  (*Id.* at 44.)

At the parole hearing on November 4, hearings officer Anthony Grzesiak found probable cause to believe that Petitioner had violated his parole, and Petitioner was ordered to remain at the Corrections Center.  (*Id.* at 21.)  Area Manager Louise Hoskins ordered Wilson to serve Petitioner with technical rule violation papers, which would place Petitioner in a diversionary program involving 90 days of intensive inpatient treatment in lieu of going back to prison.  (*Id.* at

22.)  Wilson attempted to do so on November 16, 2004, but Petitioner again refused to sign the papers and told Wilson that he wasn't going to do the program.  (*Id.* at 23, 46.)  As a consequence, on November 16, 2004, Area Manager Hoskins determined that Petitioner would be returned to prison.  (*Id.* at 22-23, 47.)

Supervisor Brad Curry notified Wilson of Hoskins' decision to return Petitioner to prison.  (Tr. II at 24.)  Several corrections officers and additional staff were called to escort Petitioner to the meditation room where transportation could be arranged.  Wilson remained in the control center while the following individuals went to escort Petitioner:  Officer Huizar, Officer Vaughn, Supervisor Curry, Agent Gottlieb and Agent Howell.  (Tr. II at 24-26.)  Although Wilson was positioned some distance away, he could hear Petitioner screaming and yelling, and he saw the officers retreating from the hallway and backing toward the control center.  He then saw Petitioner walking after the officers.  The officers retreated behind the door to the control center.  Wilson saw Petitioner pick up a table, bring it to his chest and throw it at the door that separates the hallway from the command center.  (Tr. II at 26-27.)  The table was broken.  (*Id.* at 27.)  Petitioner then ran toward the exit on the side of the building on the D-Wing, and he left the building.  (*Id.* at 28.)  Wilson ran down the hallway and looked out, but he could not see Petitioner because of the wooded area.  Wilson got into his personal vehicle and drove around the area, trying to find Petitioner  (*Id.* at 28-29.)  Later that day, after the police located Petitioner hiding in an abandoned vehicle, Wilson identified Petitioner to the police.  (*Id.*)

Officer Sefarino Huizar testified that, on November 16, 2004, he was employed at the Buena Vista Corrections Center.  (*Id.* at 59.)  On that date, Supervisor Curry directed Huizar and other officers to escort Petitioner to the meditation room.  (*Id.* at 60-61.)  According to Huizar,

- 11 -

Petitioner became extremely upset.  Petitioner stood up with two pens clutched in his fists and pointed at staff.  Petitioner, uttering profanities, declared that he would not go.  Huizar and the other officers were surprised and a bit scared.  Officer Vaughn told Petitioner to take it easy and said, "[I]t's not worth it."  (*Id.* at 61-62.)  Huizar, Vaughn and Curry stepped back out of Petitioner's room and continued to back up as Petitioner advanced toward them.  (*Id.* at 62.)  Petitioner kept the pens pointed in his closed fists and continued to swear and say that he was not going back to prison.  (*Id.* at 63.)  The officers backed up all the way to the control center and through the door.  Petitioner picked up a table and threw it at the door.  (*Id.* at 64-65.)  Petitioner turned and went back toward his room.  He then kicked the back fire door repeatedly until it opened on a timed delay.  He then jumped the fence.  (*Id.* at 65.)  Huizar picked up a radio and some belly chains and followed Petitioner, but he lost Petitioner in the thicket.  (*Id.* at 65-66.)  Huizar next saw Petitioner after the state police had handcuffed him and were leading him out of someone's private property.  (*Id.* at 66.)

Officer David Vaughn described the incident almost identically.  (*Id.* at 71-75.) Vaughn confirmed that he was frightened by Petitioner's swinging and slashing of the pens and swearing and threatening the officers, saying, "Fuck you, bitches.  I'll kill you, bitches.  I don't care nothing about you . . . ."  (*Id.* at 72.)

Jennifer Howell testified that she had worked as a parole agent at Buena Vista for ten years.  On November 16, 2004, Agent Wilson asked for her help, telling her that a prisoner needed to be returned to prison and was putting up resistance.  (*Id.* at 77.)  She left her office and came through the control center into D-wing, joining parole agent Dennis Gottlieb.  She saw Supervisor Curry and others standing in the doorway of an inmate's cell.  As they walked closer, the officers began to back out of the cell.  (*Id.* at 78.)  Petitioner came out of his cell swearing and saying he was

not going back to prison.  He threatened to kill the officers and told them that they might as well call the state police because he was not going and was going to kill everyone.  (*Id.* at 79.)  She and the other officers kept walking backward as Petitioner approached because she was afraid they were going to be killed.  (*Id.* at 80.)  After the officers were through the door and the door was closed, Petitioner threw a table at the door.  (*Id.*)  Petitioner went to his room for a short period and then exited from the end of the wing through an emergency door.  (*Id.* at 81.)

Parole agent Dennis Gottlieb testified nearly identically to Agent Howell.  (*Id.* at 83-87.)  Dennis saw Petitioner leave his room with a plastic bag.  (*Id.* at 86.)

The next witness for the prosecution was Supervisor Brad Curry.  Curry testified that in August 2004, Petitioner was assigned to his parole office and Joe Wilson was assigned as Petitioner's parole agent.  (Tr. III at 5.)  Curry identified Petitioner's original parole conditions.  He also identified a document containing Special Condition Rule No. 3.8, which required Petitioner to come to the Corrections Center whenever he was told to, until he was released by his parole agent.  (*Id.* at 5-6.)  Petitioner was in the STOP program, a substance abuse testing program, under which Petitioner was required to provide a urine sample whenever he was so directed.  (*Id.* at 6-7.)  On October 21, 2004, Petitioner failed to provide a urine sample on a day he was required to do so.  He was charged and served with a parole violation, but he refused to sign the form indicating how he intended to proceed.  (*Id.* at 7.)  Shortly thereafter, Petitioner told the officers that he needed medical attention.  Because he was on parole, he was permitted to leave to seek medical attention.  Petitioner returned to the Corrections Center on October 28, 2004.  (*Id.* at 6-7.)  On November 4, 2004, a preliminary parole violation hearing was held, and hearing officer Grzesiak found that there was probable cause to conclude that Petitioner had violated his parole.  According to Curry, Petitioner

admitted that the parole violation charge was true. (*Id.* at 8-9.)  The findings were forwarded to area manager Louise Hoskins to determine the consequences of the parole violation.  She concluded that Petitioner should be served with paperwork giving him the opportunity to go to the Technical Rule Violation Center.  Petitioner refused to agree with the decision.  (*Id.* at 9.)  After learning of Petitioner's refusal, on November 16, 2004, Hoskins ordered that Petitioner be returned to prison. (*Id.* at 10.)  Curry received notification of Hoskins' decision shortly after noon and then went to Petitioner's room with Officers Huizar and Vaughn.  Because Petitioner was no longer a parolee after the decision to return him to prison, he had to be moved to a more secure level of the facility. (*Id.* at 11-12.)  Curry told Petitioner about the decision and told Petitioner that he needed to accompany Curry.  Plaintiff asked why and was told that it would be explained to him after he complied with Curry's request.  Petitioner refused.  Curry told him again.  (*Id.* at 12.)  Petitioner then stood up, obviously angry, with pens in his hands.  The hands were originally at Petitioner's side, but, as Petitioner started cursing the officers, his hands came up.  As the officers backed up, Petitioner followed them, wildly cursing and holding the pens up.  (*Id.* at 13.)  The officers and Curry cajoled Petitioner into not continuing his actions.  (*Id.* at 29.)  Petitioner lunged at the officers on several occasions.  (*Id.* at 15.)  Agents Gottlieb and Howell came into the hallway during the officers' retreat.  All officers and agents retreated into the control center.  (*Id.* at 16.)  After the door to the control center was closed behind the officers, Petitioner threw a table at the door.  (*Id.*)  Curry then went into the control center to see that the police had been called.  He did not see Petitioner leave the building, but he heard the door alarm go off.  (*Id.* at 17.)  The officers, agents and police officers began to look for Petitioner.  Curry next saw Petitioner after he had been located by the police in a neighborhood west of the Corrections Center.  (*Id.* at 17-18.)

- 14 -

During cross-examination of Curry, Petitioner's attorney asked for a recess. Petitioner, however, blurted out that he did not want a recess and wanted his attorney to ask the questions Petitioner had given him. The court tried to get Petitioner to stop talking. Petitioner stated that his attorney was fired. (*Id.* at 32.) Petitioner then was removed from the courtroom, as was the jury. (*Id.* at 32-33.) After a short recess, Petitioner was brought back into the courtroom without the jury. The court instructed him that he could not engage in outbursts like the one he had just had. Petitioner denied having an outburst and repeated that he wanted his attorney to ask Petitioner's questions and stated that he had filed a grievance. The court again counseled Petitioner, who denied raising his voice. The court instructed Petitioner to control himself, indicating that he would give Petitioner time with his attorney and then an opportunity to make a record. (*Id.* at 34.) After another recess, court resumed. Defense counsel indicated that he did not consider the questions Petitioner wanted asked to be proper questions because they were argumentative, repetitious and irrelevant. The questions were either redundant or went to the rules and regulations of the parole system, not to the felony charges on which he was being tried. Further, counsel believed that some of the answers undoubtedly would hurt Petitioner's case. (*Id.* at 36.) The questions were copied and made part of a separate record. (*Id.*) The court also addressed the documents Petitioner wished to introduce into evidence. Counsel indicated that the documents referred to MDOC policies and policy directives, the statute bearing on community status, major misconduct violations, and a notice of the parole violation charges that the prosecutor already had introduced into evidence. (*Id.* at 37.) Petitioner argued that the documents were relevant because they showed that he was on parole; as a result, he could not have escaped lawful custody. (*Id.* at 38.) The court disagreed with Petitioner's assessment, ruling that the documents Petitioner wanted were not going to be allowed at trial, though

- 15 -

they would be made part of the separate record for appeal.  (*Id.* at 39-40.)  The court then reviewed the questions Petitioner wished to have asked.  (*Id.* at 41-43.)  Petitioner became argumentative, demanding that the questions be asked and the exhibits be presented, insisting that anything less would deprive him of his right to a defense. (*Id.* at 42-43.)  His argumentative behavior culminated in the following exchange with the court:

> THE DEFENDANT:  Give me those [documents], and you can have them take me back to the prison.  You all can have the trial without me even here because you done already showed me on the record that I'm not allowed to really put up a defense.

> THE COURT:  You're going to put up your own defense.

> THE DEFENDANT:  My –

> THE COURT:  You are not going to run this courtroom.  I have been more than patient with you.

> THE DEFENDANT:  Sir, I'm not trying to run your courtroom.

> THE COURT:  Yeah, I have been more than patient with you and I've had it up to here.

> THE DEFENDANT:  I'm not trying to run your courtroom, but this man is not – I feel like he's not defending me –

> THE COURT:  Take him out of here right now.

> THE DEFENDANT:  – and I don't want him representing me.

> THE COURT:  – and if you don't want to put your exhibits in, you're going to suffer the consequences.

(*Id.* at 43-44.)  After Petitioner was removed from the courtroom, the judge indicated that, in 30 years as an attorney and nearly 10 years on the bench, he had not had a defendant like Petitioner. (*Id.* at 46.)  When the jury returned, the court told the jury that Petitioner had elected to not be present and that the court was going to adjourn for the remainder of the day to take up other matters.

The court also instructed that, whether or not Petitioner was seated in the courtroom the next day or whether he was present by video, it was of no concern to the jurors, whose sole job was to make a determination on the evidence presented and the law as instructed.  (*Id.* at 47-48.)  After the jury was excused, the court asked counsel whether anything else needed to be put on the record.  The court indicated, "I think we're all in agreement that for safety reasons he was – he chose to leave, and I certainly wasn't going to stop him . . . ."  At that juncture, Sergeant Demand advised the court that "Inmate Cochrane stated in lockup in front of two Department of Corrections transport officers and Deputy Lysogorski that he would not be sitting in front of a monitor watching his proceedings, you might as well take me back."  (*Id.* at 49-50.)  Demand also reported that Petitioner had been screaming continuously since leaving the courtroom.  (*Id.* at 50.)  The court indicated that it had contemplated using a video hookup for witnesses here and having it transmitted to a cell in the jail.  The court instructed Sergeant Demand to ask Petitioner again in the morning whether he wished to watch his proceedings on such a video.  (*Id.* at 50.)

The following morning, the court opened its session outside the presence of the jury, and Petitioner was present in the courtroom.  The court asked Petitioner if he wished to continue to be present or wished to leave the courtroom.  Petitioner indicated that he intended to remain in the courtroom and testify.  (Tr. IV at 4.)  Defense counsel also put on the record that, in accordance with Petitioner's request, counsel had approached the prosecutor about a plea agreement on Count IV, but the prosecution expressed no interest in a plea at that point in the trial.  (*Id.*)

Trial resumed with the continuation of defense counsel's cross-examination of Supervisor Curry.  Curry testified that he did not remember Petitioner telling him that he was unable to urinate.  (*Id.* at 5.)  He did, however, remember that Petitioner had a urinary tract infection for

which he was taken to the hospital on October 21, 2004.  Upon refreshing his recollection, he remembered Petitioner saying that he could not urinate on October 20, 2004.  (*Id.* at 6-7.)  Further, the parole agent recorded in a written report that Petitioner was able to provide a urine sample at 4:20 p.m. on October 20, outside of the timeframe required by the rules.  (*Id.* at 8, 11.)

Saginaw County Sheriffs Department Detective Ian Davies testified that, just after 3:00 p.m. on November 16, 2004, he responded to a call about an escape from the Corrections Center.  He and Detective Pfau traveled in separate cars to an area neighborhood and then began to search on foot.  (*Id.* at 14.)  While they were canvassing the area, a female resident suggested that they look in some abandoned vehicles on her property.  One of the vehicles parked to the side of the house was covered with a tarp.  When Detective Pfau lifted the tarp, they saw Petitioner lying on the front seat of the vehicle with his feet pointing toward the driver's-side door.  (*Id.* at 16.)  The officers identified themselves as police officers and repeatedly ordered Petitioner to get out of the vehicle.  Petitioner refused and made a defensive move with his feet, as if to kick the officers.  Detective Pfau attempted to break the window with a flashlight, but he was unsuccessful.  (*Id.* at 17-18.)  Detective Pfau opened the driver's door, causing Petitioner to pull his legs back as if to kick.  At that point, City of Saginaw Police Officer Shaltry came over to the car and began ordering Petitioner to get out.  When Petitioner repeatedly failed to comply and after warnings, Shaltry used a Taser to stun Petitioner.  After being stunned, Petitioner complied and exited the vehicle and was placed under arrest.  (*Id.* at 18-19.)

Officer Shaltry testified that, on November 16, 2004, he was a road patrol officer.  While on duty, he was dressed in a full uniform, and he carried a sidearm, a shotgun, a rifle and a Taser.  He also responded to the escape call and was searching the neighborhoods in the area.  He

- 18 -

eventually arrived at the tarp-covered vehicle, where he saw Petitioner on the front seat, crouched down with his head toward the passenger door. Shaltry ordered Petitioner to get out of the vehicle and threatened to use the Taser. Petitioner did not comply, and Shaltry shot him with the Taser. After being shot, Petitioner decided to come out of the vehicle. (*Id.* at 24-27.)

Detective Pfau testified that, while searching the area on foot with Detective Davies, a woman waived at him from in front of her house. She asked him to search two cars located on her property. (*Id.* at 34.) When Pfau looked inside the second vehicle, he saw Petitioner crouched in the front seat. Pfau took a picture of Petitioner in the vehicle, which he identified at trial. (*Id.* at 35-36.) Pfau identified himself as a police officer and at least eight to ten times ordered Petitioner to get out of the car and lay flat on the ground. Davies also shouted orders to do the same. Petitioner never complied. (*Id.* at 36-37.) Because the door was locked, Pfau attempted to break the window. When he could not do so, Petitioner unlocked the door. Pfau opened the door and again repeatedly ordered Petitioner to get out of the car and lay flat on the ground. (*Id.* at 37.) After Officer Shaltry arrived, all three officers continued to issue orders to Petitioner. Shaltry informed Petitioner that, if he did not comply, Shaltry would use the Taser. Petitioner did not comply, so Shaltry deployed the Taser. After being shot with the Taser, Petitioner finally obeyed the officers' orders and got out of the car. Pfau handcuffed Petitioner and then searched him. Pfau did not find the pens Petitioner had been holding at the Corrections Center. Sergeant Phelps transported Petitioner to the jail. (*Id.* at 38-39.) Pfau then returned to the Corrections Center and took photographs, including one of the broken table. (*Id.* at 40.)

The prosecution rested its case, and Petitioner moved for a directed verdict on all four counts. (*Id.* at 48-49.) The court denied the motion. (*Id.* at 51.)

Petitioner testified that he was paroled in August 2004 to live in his mother's house. He was told that, after he got to Saginaw, he should to go to the Buena Vista Corrections Center and report to parole agent Joe Wilson. (*Id.* at 56.) At the time of his parole, Petitioner's parole conditions included the requirements that he not change his address without notifying his agent, that he stayed out of bars, that he not drink alcohol or take drugs, and that he not leave the state. (*Id.* at 57.) When Petitioner reported to his parole agent a week later, Wilson told Petitioner that he would be required to participate in an outpatient program called STOP. The program would require him to call an 800 number every morning. If the recording listed the last digit of his social security number, Petitioner was required to come into the Corrections Center to give a urine drop. (*Id.*) If the drop tested negative, Petitioner could leave. (*Id.* at 59.) In addition, Petitioner was required to attend a substance abuse class at the facility for two hours, at least once each week for 28 sessions. Petitioner was not required to live at the center. (*Id.* at 58-59.) Petitioner complied with the requirements for 67 days. (*Id.* at 59.) On October 20, 2004, Petitioner called the number and reported to the Corrections Center at 9:30, intending to be tested before his class began at 10:00. (*Id.* at 60.) He tried to provide a urine sample, but he could not. He went to Wilson and told him that he had bad kidneys, which had been hurting for a couple of days and that he could not urinate. He told Wilson that he would go to his class and then try again, and Wilson agreed. (*Id.* at 61.) Petitioner went to his class. At 11:30, during a break in class, Petitioner told the teacher that he had to go provide a urine drop. When he arrived at the window, the officer refused to allow him to give a sample because it was 11:31, one minute after the deadline. Petitioner was told that he would have to "do three days" at the center. (*Id.* at 62.) After his class, Petitioner tried to see his parole agent, who was not there. (*Id.* at 63-64.)

- 20 -

Petitioner drove home from the facility, picked up three changes of clothes, and walked back.  When he arrived at about 12:30 p.m., Supervisor Curry asked him where he had been, telling him he was not supposed to have left the facility.  Petitioner was then placed in the "hole" at the Corrections Center, a locked cell containing a bed and toilet.  (*Id.* at 64-65.)  At about 3:00 p.m., Petitioner was having bad pains and began knocking on the door.  Someone eventually came to the door to ask him for a urine sample.  That person, however, did nothing in response to Petitioner's request to see a doctor.  (*Id.* at 65.)  When breakfast was delivered the next morning, Petitioner did not get up.  When they came to pick up the tray, Petitioner again explained that he had really bad pain during urination and that the pain had gone to his chest and his stomach was hurting.  Petitioner's parole agent was called.  Petitioner reminded Agent Wilson that he had previously told him he was having kidney problems.  Petitioner now was really sick and told Wilson he needed to go to the hospital.  Wilson drove him to Covenant Hospital.  (*Id.* at 66.)  After a wait of about four hours, Petitioner was given a prescription for a bladder infection.  He called Wilson, who told Petitioner to wait at the hospital for Wilson to pick him up.  Wilson drove him back to the Buena Vista Center.  During the drive, Petitioner asked why he had to stay at the Corrections Center, and Wilson told him it was because he did not urinate when required by the STOP program.  (*Id.* at 67.)

After he arrived at the Center, Petitioner was advised that they did not fill prescriptions.  After several days, Petitioner got half of his prescription filled, and the second half was filled three days later.  In the meantime, Petitioner had communicated with his parole agent, who told him to return to the Center when the prescription was filled to complete the remaining two days of his penalty.  (*Id.* at 68-69.)  Petitioner returned to the Center on October 28, 2004.  On October 30, Wilson told Petitioner that he owed an additional three days at the Center for leaving

- 21 -

the Center to go to the hospital.  (*Id.* at 70.)  After serving the additional days, Petitioner's parole

agent told Petitioner that the agent would issue a parole violation for the two events.  After Petitioner

had spent 21 days in the facility, Petitioner again asked to see his parole agent.  (*Id.* at 70-71.)

Petitioner asked why he wasn't being released.  Wilson told Petitioner that he had angered Wilson's

supervisor by leaving the facility, and that is why he was put in the hole.  (*Id.* at 72.)  Petitioner

argued that his parole conditions did not require him to stay in the facility.  Wilson told Petitioner

to just do as he was told.  (*Id.* at 73.)  At about 1:00, Curry and two officers came down the hallway

and told Petitioner to follow them.  Petitioner asked where he was being taken and then stated that

he was writing a letter.  (*Id.* at 73-74.)  Petitioner admitted that he was speaking loudly and that he

had a pen in his hand as he began to approach the officers.  He began shaking that pen at his side

as he yelled. (*Id.* at 79.)  But Petitioner denied that he was stabbing at the officers or that he intended

to assault them.  (*Id.*)  According to Petitioner, no one told him that he was being returned to prison.

(*Id.*)  The officers left the room and Petitioner put his head out in the hallway.  Other prisoners in

the hallway told Petitioner that he was probably going to be taken to the hole.  Petitioner turned and

went out the back door.  (*Id.* at 74-75.)

       While walking home, Petitioner saw numerous police cars and concluded they were

searching for him.  He hid in the back of an abandoned car.  (*Id.* at 75.)  After about 20 minutes, an

individual came and lifted up the canvas covering the car.  Petitioner saw about seven or eight police

officers pointing shotguns and pistols at the car.  Petitioner was holding his hands in the air, as

directed by the officers.  Someone started to hit the window and told Petitioner to open the door.

He did not move because they were telling him to keep his hands up.  Eventually, Petitioner told

them he was opening the door.  As soon as Petitioner unlocked the door, an officer snatched the door

open and someone shot Petitioner with the Taser.  (*Id.* at 76-77.)  Every time Petitioner tried to move

to get out of the car, he was shocked again with the Taser.  An officer told the others to let Petitioner

out of the car.  Petitioner got out and laid on the ground.  The officers again shot him with the Taser.

(*Id.* at 77.)  When Petitioner asked why they would not quit Tasing him, the officers told him that

next time he would not hide from them.  (*Id.* at 78.)  Petitioner was handcuffed, patted down, and

taken to the jail.  (*Id.* at 78.)

On cross-examination, Petitioner denied having been shown the parole violation

charges on October 21 and denied refusing to sign the form.  Petitioner acknowledged that he had

not mentioned the hearing on November 4, which he contended was not a parole violation hearing.

(*Id.* at 80-81.)  Petitioner denied that Wilson ever offered him the deferral program.  (*Id.* at 81-82.)

Petitioner claimed that all of the officers were lying when they said he came after them with two

pens.  (*Id.* at 82-84.)  He also denied throwing the table at the door.  (*Id.* at 85.)

At the conclusion of trial, on November 6, 2006, the jury found Petitioner not guilty

of felonious assault, but guilty of the remaining three counts. (Tr. V at 3.)  On November 29, 2006,

Petitioner was sentenced to imprisonment for 4 years and 10 months to 15 years on the assault

conviction, 6 years and 4 months to 29 years on the escape conviction, and 3 years and 10 months

to 15 years on the resisting or obstructing conviction.  (Sentencing Transcript, (S. Tr.), at  8-9,

docket #26.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel[3] on June 27, 2008, raised the same issue presented in this application for habeas corpus relief as Ground I:  that Petitioner was denied his right to self-representation.  (*See* Def.-Appellant's Br. on Appeal, docket #27.)   Petitioner filed a *pro per* supplemental brief on appeal, raising three additional issue:  (1) ineffective assistance of trial counsel; (2) insufficiency of the evidence on the escape conviction; and (3) denial of due process when the trial court rejected Petitioner's *pro per* motions filed while he was represented by counsel.  (*See* 9/2/08 Def.-Appellant's Supp. Br. on Appeal, docket #27.)   By unpublished opinion issued on November 13, 2008, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* 11/13/08 Mich. Ct. App. Op. (MCOA Op.), docket #27.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same four claims presented to and rejected by the Michigan Court of Appeals.  By order entered February 24, 2009, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* 2/24/09 Mich. Ord., docket #27.)

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect

---

[3]It appears from the docket sheet of the Saginaw County Circuit Court that five separate attorneys were appointed as appellate counsel for Petitioner, the last of which was the State Appellate Defender's Office.  (Cir. Ct. Docket Sheet at 9-10.)

to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably

refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable."  *Id.* at 410.

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1);  *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).  Applying the foregoing standards under the AEDPA, I find that Petitioner is entitled to habeas relief.

## **Discussion**

### I.     Denial of the Right to Self-Representation

In his first ground for habeas relief, Petitioner contends that the trial court denied him the right to represent himself, in violation of the Sixth Amendment.  The Sixth Amendment, applicable to the states through the Due Process Clause of the Fourteenth Amendment, provides that a criminal defendant shall have the right to the assistance of counsel in his defense.  *See* U.S. Const.

amend. VI; *see also Faretta v. California*, 422 U.S. 806, 832-34 (1975)*; Martinez v. Ct. of Appeal of Cal.*, 528 U.S. 152, 154 (2000). This right necessarily implies its corollary, that a defendant has a right to proceed without counsel and represent himself. *Faretta*, 422 U.S. at 832-34; *see also United States v. Mosely*, 810 F.2d 93, 97 (6th Cir. 1987) ("'The right to defend *pro se* and the right to counsel have been aptly described as "two faces of the same coin," in that waiver of one right constitutes a correlative assertion of the other.'") (quoting *United States v. Conder*, 423 F.2d 904, 908 (6th Cir. 1970)). "[F]orcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." *Faretta*, 422 U.S. at 817.

Given the importance of the right to counsel, however, a defendant's request for self-representation must be unequivocal and his waiver of his right to counsel and the decision to proceed *pro se* must be knowing, voluntary and intelligent. *See Faretta*, 422 U.S. at 834-35; *Johnson v. Zerbst,* 304 U.S. 458, 464-65 (1938). For any such waiver to be effective, the defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). Whether a defendant's choice was made with "eyes open" generally "depend[s], in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Zerbst,* 304 U.S. at 464-65. The Supreme Court has "not prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel," *Iowa v. Tovar*, 541 U.S. 77, 88 (2004), and there is "no sacrosanct litany for warning defendants against waiving the

right to counsel."[4]  *United States v. Jones*, 421 F.3d 359, 363 (5th Cir. 2005).  However, less rigorous warnings are required before trial than at trial "because, at that stage, 'the full dangers and disadvantages of self-representation . . . are less substantial and more obvious to an accused than they are at trial.'"  *Tovar*, 541 U.S. at 90 (quoting *Patterson v. Illinois*, 487 U.S. 285, 299 (1988)).

In addition, the Supreme Court has recognized that the right to self-representation "'is not absolute.'"  *Indiana v. Edwards*, 554 U.S. 164, 171 (2008) (holding that in the context of prior issues of mental competency may permit a state to limit the right of self-representation) (quoting *Martinez*, 528 U.S. at 162).  As the *Faretta* Court itself observed, "[t]he right of self-representation is not a license to abuse the dignity of the courtroom." 422 U.S. at 834 n.46 (internal quotation omitted).  "[T]he government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.  *Martinez*, 528 U.S. at 162 (holding that the right of self-representation does not apply on direct appeal in a criminal case).  For example, courts may require that a defendant make his request to represent himself in a timely fashion.  *Id.*  In addition, a court may appoint standby counsel even without the express consent of the defendant.  *Id.*  Nevertheless, a court is not required to appoint standby counsel or permit "hybrid" representation.  *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984).  Further, the trial judge need not provide personal instruction on procedure or otherwise assist the defendant.  *Id.* (citing *McKaskle*, 465 U.S. at 183-84).  Moreover, the trial judge may terminate self-representation by a

_____

[4]The Court notes that the Sixth Circuit requires federal district courts within the circuit to conduct an inquiry as set forth in *1 Bench Book for United States District Judges* 1:02-2 (3d ed. 1986) before accepting a waiver of a right to an attorney.  *King v. Bobby,* 433 F.3d 483, 492 (6th Cir. 2006); *United States v. McDowell*, 814 F.2d 245, 250 (6th Cir. 1987).  However, this type of formal, detailed inquiry is not required by clear Supreme Court precedent.  *King,* 433 F.3d at 492. Accordingly, in the context of federal habeas review, there is no script that a state court must follow in determining whether a criminal defendant has made a "knowing, voluntary, and intelligent" waiver of counsel.  *Id.* Rather, the state court must reasonably apply Supreme Court precedent, which requires looking at the "whole record" to determine if the defendant made a knowing and intelligent waiver.  *Id.*

defendant who deliberately engages in serious and obstructionist misconduct. *Faretta*, 422 U.S. at 834 n.46 (citing *Illinois v. Allen*, 397 U.S. 337, 342 (1970) (holding that a defendant's right to confront witnesses may be overcome by the defendant's engagement in disruptive conduct)).

Finally, "[s]ince the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to "harmless error" analysis. The right is either respected or denied; its deprivation cannot be harmless." *McKaskle*, 465 U.S. at 177 n.8; *see also Washington v. Renico*, 455 F.3d 722, 734 (6th Cir. 2006) (holding that "denial of the *Faretta* right is a structural error for which [defendant] need not show any prejudice") (citing *McKaskle*, 465 U.S. at 177 n.8).

In the instant case, the Michigan Court of Appeals analyzed the issue applying the Michigan Supreme Court's standard for reviewing requests for self-representation:

> Defendant argues that he was denied his constitutional right to represent himself when his repeated requests for self-representation were continuously denied. We disagree.
>
> A criminal defendant's right to self-representation is guaranteed by the Sixth Amendment of the United States Constitution, art 1, § 13 of the Michigan Constitution, and MCL 763.1. *People v Williams*, 470 Mich 634, 641-642; 683 NW2d 597 (2004). Our Supreme Court in *People v Russell*, 471 Mich 182, 190; 684 NW2d 745 (2004), explained:
>
> > Upon a defendant's initial request to proceed pro se, a court must determine that (1) the defendant's request is unequivocal, (2) the defendant is asserting his right knowingly, intelligently, and voluntarily through a colloquy advising the defendant of the dangers and disadvantages of self-representation, and (3) the defendant's self-representation will not disrupt, unduly inconvenience, and burden the court and the administration of the court's business.
>
> A trial court must also satisfy the requirements of MCR 6.005(D), which requires the court to provide certain advice to the defendant and an opportunity to consult with an attorney. *Id.* at 190-191. Substantial compliance with these requirements is adequate. *Id.* at 191.

The record shows several requests by defendant to represent himself, beginning approximately 11 months before trial. He made his requests orally and in writing. One of his appointed attorneys also filed a motion for self-representation on defendant's behalf. Despite these requests, the court repeatedly denied defendant's requests. It is evident from the record that self-representation was denied on the basis that it would disrupt, unduly inconvenience, and burden the court and the administration of the court's business. We hold that there is ample evidence in the record to support this conclusion.

Defendant complained that his first court-appointed attorney was not doing his job, and defendant requested appointment of a new attorney, which request was honored by the trial court. His second court-appointed attorney presented numerous motions to the court as demanded by defendant; however, the attorney later moved to withdraw as counsel on defendant's request. Defendant complained to the trial court that it kept appointing attorneys who refused to raise motions as demanded by defendant. The trial court permitted withdrawal and, with defendant's approval, indicated that it would appoint a third attorney for defendant. At a subsequent hearing, defendant informed the trial court that he filed a grievance against the third court-appointed attorney and that said attorney "is not representing me" because defendant "asked him to get off the case." When the court responded that it was up to the court to determine whether counsel would continue representing defendant, defendant replied, "I was just letting you know." Later, the third court-appointed attorney moved to withdraw as counsel because defendant grieved him and because there was a breakdown of the attorney-client relationship. Defendant agreed to the withdrawal, and the court ordered withdrawal. A fourth attorney, who eventually handled the trial, was then appointed as counsel for defendant.

The record also indicates that defendant filed a grievance against the trial judge, who first presided, with the Judicial Tenure Commission, claiming that the judge was allowing the prosecutor to engage in malicious prosecution and that the judge would not allow defendant to present any evidence in his defense. The record is replete with letters and motions from defendant directed to the trial court, many of which are simply ridiculous.

On the first day of trial, prior to jury selection, defendant behaved in a disruptive manner, continually interrupting the court and rambling on about anything and everything. The exasperated trial judge finally asked defendant if he intended "to disrupt the courtroom" during trial. After a short recess, and still prior to jury selection, the court, for purposes of making the record, discussed defendant's demeanor and temperament. The court indicated that defendant stated that he would not assist his attorney, and the court noted that defendant spit at his attorney. The trial court further noted that defendant had remained standing throughout the morning session, cutting off speakers at various times. Additionally, the court stated that court officers agreed that defendant needed to be shackled because of his

behavior.  The trial court was of the opinion that defendant was going to "cause problems."  The court stated that it had some safety concerns that defendant, because of his temperament, might take a "swing" at his attorney or the court's law clerk, who sat close to the defense table.  Defense counsel conceded that defendant had been hostile.  Moreover, there was an outburst by defendant during trial in which defendant demanded that his attorney ask certain questions and yelled that counsel was "fired."  The trial court noted that, in 30 years of practice and 10 years on the bench, it had never dealt with a person "quite like Mr. Cochrane."  Defendant's behavior at trial cannot be deemed justifiable on the basis of the denials of his requests for self-representation.  Rather, his behavior was reflective of his general demeanor and attitude toward the court and the legal process and revealed a manipulative and hostile personality.

On this record, we hold that there was no error in rejecting defendant's requests for selfrepresentation.

(MCOA Op. at 1-3.)

The Court of Appeals decision makes no mention of Judge Jackson's order granting defendant the right to defend himself.

The standard articulated by the state court is not identical to the standard articulated in *Faretta*.  While the first two elements of the state test are the same as those established by *Faretta*, the third element appears to be an effort by the state to formalize *Faretta*'s recognition that "[t]he right of self-representation is not a license to abuse the dignity of the courtroom."  *Id.*, 422 U.S. at 834 n.46.  In *Faretta* and subsequent cases, the Supreme Court has recognized that, in limited circumstances, the government's interest in ensuring the integrity and efficiency of the trial may outweigh the defendant's interest in acting as his own lawyer.  *Martinez*, 528 U.S. at 162 (discussing the timeliness of the request, the behavior of the defendant, and the appointment of stand-by counsel); *see also United States v. Mabie*, 663 F.3d 322, 328 (8th Cir. 2011) (citing *United States v. Edelmann*, 458 F.3d 791, 808-09 (8th Cir. 2006) ("The right [to self-representation] does not exist . . . to be used as a tactic for delay, for disruption, for distortion of the system, or for manipulation

of the trial process.") (internal quotation omitted)); *Robards v. Rees*, 789 F.2d 379, 383 (6th Cir. 1986) (holding that the invocation of the right for the first time on the date scheduled for trial may be a sufficient reason to deny the request on the basis of undue delay).

Here, Petitioner's early requests for self-representation could not have resulted in a delay of trial or other significant disruption to the system. Petitioner first invoked his right to self-representation nearly a year before trial. Three additional requests, one of which was granted, came months before the extended trial dates. Further, the trial court repeatedly delayed trial after it granted three motions to excuse appointed counsel. Not only was delay not a consideration of the court in denying Petitioner's requests, but also delay was one reason Petitioner wished to represent himself, as the repeated substitutions of counsel had led to lengthy delays of his trial. (5/23/06 Hr'g Tr. at 3-5, docket #19.)

In denying Petitioner's request to represent himself, Judge Borello simply stated that, given the apparently frivolous nature of some of Petitioner's *pro se* motions, self-representation was likely to be problematic. However, nothing about the *Faretta* decision or subsequent cases suggests that the mere inconvenience to the court in having to decide meritless motions is on the same footing as the defendant's constitutional right to self-representation. *See United States v. Royal*, 43 F. App'x 42, 45 (9th Cir. 2002) (recognizing that mere inconvenience is insufficient to warrant denial of the right of self-representation). The fundamental rule remains that a state may not "force a lawyer upon [a defendant], even when he insists that he wants to conduct his own defense." *Faretta*, 422 U.S. at 807. In *Faretta* itself, the Supreme Court considered circumstances in which the trial court had granted the defendant's motion to represent himself, but subsequently terminated the defendant's self-representation based upon a conclusion that the defendant was insufficiently informed about

legal matters and therefore could not properly represent himself. The *Faretta* Court held that, in

determining whether a defendant knowingly and voluntarily waives his right to counsel, a court may

not assess his technical legal knowledge, as it is irrelevant to "an assessment of his knowing exercise

of the right to defend himself." *Id.* at 836.  A court may not simply conclude that a defendant is not

entitled to represent himself on the basis that his strategy is foolish or misguided:

> It is undeniable that in most criminal prosecutions defendants could better defend
> with counsel's guidance than by their own unskilled efforts.  But where the
> defendant will not voluntarily accept representation by counsel, the potential
> advantage of a lawyer's training and experience can be realized, if at all, only
> imperfectly.  To force a lawyer on a defendant can only lead him to believe that
> the law contrives against him.  Moreover, it is not inconceivable that in some rare
> instances, the defendant might in fact present his case more effectively by conducting
> his own defense. Personal liberties are not rooted in the law of averages.  The right
> to defend is personal.  The defendant, and not his lawyer or the State, will bear the
> personal consequences of a conviction.  It is the defendant, therefore, who must be
> free personally to decide whether in his particular case counsel is to his advantage.
> And although he may conduct his own defense ultimately to his own detriment, his
> choice must be honored out of "that respect for the individual which is the lifeblood
> of the law."

*Id.* at 834 (quoting *Allen*, 397 U.S. at 350-351) (Brennan, J., concurring)).  Instead, the *Faretta* Court

emphasized that a court "may *terminate* self-representation by a defendant who deliberately engages

in serious and obstructionist misconduct . . . ."  *Id.* at 422 U.S. at 834 n.46 (emphasis added).

Nothing suggests that the Supreme Court has authorized trial courts to deny self-representation

based on the anticipated additional workload posed by a defendant's frivolous defense.  *See United*

*States v. Flewitt*, 874 F.2d 669, 674 (9th Cir. 1989) (construing footnote 46 in *Faretta* to mean that

"a defendant's right to self-representation does not allow him to engage in uncontrollable and

disruptive behavior in the courtroom").[5]

---

[5]In contrast, had the trial judge permitted Petitioner to proceed *pro se*, and had Petitioner subsequently refused to accept the court's rulings on those motions or failed to observe the other rules of the court, he arguably could have had his right to self-representation revoked, on the basis that he was engaged in obstructionist or disruptive behavior

In sum, the Supreme Court has only recognized limitations on the right to self-representation at trial for behavior rising to the level of an abuse of the court, intentional serious misconduct or undue inconvenience (such as that caused by an untimely request).  By interpreting the state standard in the way it did, the Michigan Court of Appeals applied an incorrect federal standard to Petitioner's constitutional claim.   The analysis, therefore, was contrary to clearly established Supreme Court precedent.

Moreover, the appellate court's recitation of the history of the case is inaccurate and misleading.  Contrary to the ruling of the appeals court, Judge Jackson actually granted one of Petitioner's motions to represent himself.  But the judge's decision was completely ignored by the subsequent judges, by the prosecution and by the later-appointed defense attorney.  No "abusive" conduct intervened between that grant of the right of self-representation and Judge Kaczmarek's denial of the right.  Further, nothing in the record supports the court of appeals' presumption that any trial judge other than Jackson[6] actually considered or applied the two prongs of the federal inquiry:  whether Petitioner had unequivocally asserted the right and whether his request was knowing, intelligent and voluntary, based on an appropriate colloquy.  *See Russell*, 684 N.W.2d at 750-51.

---

within the meaning of *Faretta*.  422 U.S. at 834 n.46 (citing *Allen*, 397 U.S. at 343 (describing the type of conduct that causes a defendant to lost his right to be present at trial)).

[6]Although Judge Jackson did not conduct a formal colloquy into the voluntariness of Petitioner's request, he did conduct an inquiry into Petitioner's understanding of the consequences of allowing his attorney to withdraw.  In response, Petitioner gave a lengthy explanation of his reasons for wishing to represent himself that demonstrated that he understood the nature of his decision and voluntarily wished to represent himself.  Further, counsel for Petitioner had previously stated on the record that Petitioner was intelligent and capable of representing himself.  Given that no formula for inquiry is required by Supreme Court precedent, *see Tovar*, 541 U.S. at 90, and given that less inquiry is required in the pretrial stages, *id.*, Judge Jackson's inquiry into the knowledge, understanding and voluntariness of Petitioner's request was constitutionally sufficient.

It is beyond dispute that Petitioner unequivocally and repeatedly invoked his right to self-representation, and the Michigan Court of Appeals clearly recognized that fact. It is equally beyond dispute that Judges Borello, Kaczmarek and Borchard never conducted a colloquy or even considered whether Petitioner's invocation of the right was knowing and voluntary. Judge Borrello limited his decision to considering whether Petitioner's self-representation would be inconvenient because Petitioner had filed meritless *pro se* motions. And Judges Kaczmarek and Borchard simply relied on Judge Borrello's decision, without consideration of the appropriate standard. As the Sixth Circuit recognized in *Moore v. Haviland*, 531 F.3d 393, 402-03 (6th Cir. 2008), a court's failure to engage in a "*Faretta*-compliant colloquy upon [a clear invocation of the right of self-representation] [i]s an unreasonable application of *Faretta*."

Finally, the state appellate court erred in relying upon Petitioner's behavior at trial to support its conclusion that Petitioner's behavior warranted denial of his right to self-representation eleven months or even two months before trial. Petitioner's trial behavior occurred only after he had repeatedly been denied his right of self-representation, and, to pour salt in the wound, even after the order had been granted by Judge Jackson, which order was ignored by subsequent judges. While not acceptable, Petitioner's frustration was understandable. Regardless, because the denial of the right of self-representation is structural error, a reviewing court may not consider whether the error is harmless. *See McKaskle*, 465 U.S. at 177 n.8 (denial of the right of self-representation is not subject to harmless-error review); *Washington*, 455 F.3d at 734. Petitioner's behavior at trial therefore cannot be used to justify the repeated denials of counsel that occurred months before any trial misconduct.

For all these reasons, the court of appeals' determination was both contrary to and an unreasonable application of clearly established Supreme Court precedent.

II.    Remaining Claims

Because Petitioner's first habeas ground is dispositive, there is no purpose to be served in addressing his remaining issues at this time.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be conditionally granted unless the state retries Petitioner within 120 days of the final decision in this case.

Dated:  August 28, 2012                     /s/ Hugh W. Brenneman, Jr.
                                            HUGH W. BRENNEMAN, JR.
                                            United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).   Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).